UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                          Case No. 05-11832-DHW
                                               Chapter 7
KIMBERLY GAIL BOZEMAN,

    Debtor.
_____

COLLIER H. ESPY, JR., Trustee,

    Plaintiff,

v.                                             Adv. Proc. No. 06-01022-DHW

KIMBERLY GAIL BOZEMAN,

    Defendant.

MEMORANDUM OPINION

The chapter 7 trustee filed a complaint under 11 U.S.C. § 727(a)(3) and (5) to deny the debtor a discharge. Trial was held in Dothan, Alabama on August 16, 2006. Benton H. Persons represented the debtor/defendant, Kimberly Gail Bozeman, and the trustee represented himself.

About a year and one-half prior to filing for bankruptcy relief, the debtor received a settlement from Perdue Farms in the amount of $271,656.61. By the time of bankruptcy, the money was gone. The trustee contends that the debtor has not adequately explained the loss of the funds. For the following reasons the court agrees with the

trustee, and judgment will enter denying the debtor a discharge in this chapter 7 case.

## Jurisdiction

The court's jurisdiction in this adversary proceeding derives from 28 U.S.C. § 1334 and from the order of the United States District Court for this district referring title 11 matters to the bankruptcy court. Further, because an objection to the debtor's discharge is a core proceeding under 28 U.S.C. § 157(b)(2)(J), this court's jurisdiction is extended to the entry of a final order or judgment.

## Findings of Facts

The debtor formerly raised poultry for Perdue Farms. In March 2004, she received a $271,656.61 lump sum settlement from Perdue Farms resolving a dispute. She turned the settlement funds over to her parents who disbursed the money to her periodically in the form of cash and checks in differing amounts from March 14, 2004 to August 12, 2005.[1]

The cash disbursements usually ranged from $1,000 to $2,000 and totaled around $14,700. Most of the checks ranged from $3,000 to $5,000. She received five checks in the amount of $10,000 and one in the amount of $20,000. The debtor did not deposit all of the checks; she cashed some of the checks.[2] She filed a petition under chapter 7 on September 1, 2005 by which time the entire $271,656.61 was gone.

---

[1] She turned the money over to her parents allegedly to prevent her former husband access to the money. He had moved back in with her and had a drug problem.

[2] It is not possible from the evidence to determine accurately which checks were deposited and which were not because she made deposits from sources other than the settlement proceeds.

2

The debtor has four children, currently ranging in age from 1 to 16. Her former husband is incarcerated. The debtor stopped raising poultry in May or June 2004. In January 2005, she started a business repairing storm damage to homes. She issues estimates and usually pays for labor and materials but hires others to do the actual repairs.

Schedule I reflects a monthly income of $2,429, comprising $1,875 from self-employment and $554 from her mother on a vehicle they own together.[3] Schedule J reflects monthly expenses of $2,360.25. She did not allocate any clothing expense. The debtor testified that her expenses at filing were about the same as her expenses in the fall of 2004. However, she had some additional expenses in 2004 due to the birth of one child and some orthodontic expenses for another. The debtor lives in a trailer owned by her father and pays no rent.

The debtor testified that, out of the settlement proceeds, she repaid a debt to her father in the amount of $40,000, repaid a debt to her mother in the amount of $25,000, and repaid a debt to Covington County Bank in the amount of $33,337.20.[4] Repayment of these debts accounts for $98,337.20, leaving a balance of $173,319.41.

The trustee submitted a copy of the debtor's bank statements and canceled checks for the 17-month period preceding the petition.[5] On April 8, 2004, the debtor had a $2,702.03 balance in her checking account. From April 8, 2004 to September 6, 2005, she made deposits of $137,652.80 and wrote checks and incurred debits to others totaling

---

[3] Her Statement of Financial Affairs reflects that in the first 8 months of 2005, she earned $15,000 from her storm damage repair work.

[4] The repayment of these debts is outside the recovery period for a preferential transfer under 11 U.S.C. § 547.

[5] The statements comprise two checking accounts held at different banks during the relevant time period.

3

$129,878.11.[6] In addition, she withdrew cash in the amount of $9,793.71.[7] Her ending balance on September 6, 2005 was $683.01.

Some of the deposits made by the debtor during the relevant period represent income from repair jobs and income from her poultry business. The debtor testified that as much as $11,500 in deposits are attributable to income from repair jobs and $4,500 in deposits are attributable to income from her poultry business.

The debtor wrote 92 checks to Babbie Quick Stop during the relevant time period totaling $8,348.96. Babbie Quick Stop is a convenience store near the debtor's home where she purchases gasoline, oil, cigarettes, snacks and candy for the kids, and some food. Numerous checks were written in even dollar amounts. Thirty nine of the checks were written for $100 or more. Of those, six were written for around $200, one for $300, one for $350, and one for $450. She testified that she "may have" cashed checks at Babbie Quick Stop and that "probably" some of the checks were for cash.

The debtor testified that she did not keep receipts of cash purchases unless the purchases were tax-deductible. The debtor offered into evidence receipts totaling $6,848.75 for cash expended.[8] They range from medical bills to auto repairs to day care expenses.

Other than the receipts she produced, the debtor was not able to

---

[6] This amount includes miscellaneous debits to the debtor's account, such as insufficient fund fees.

[7] The withdrawals were mainly in the form of checks made payable to either "Cash" or "Cash in Person." The checks total $9,230 and are numbered as follows: 1579, 1640, 1741, 169, 190, 254, 297, and 404. In addition, she withdrew $563.71 in cash when she closed her account at Covington County Bank.

[8] A few of these are outside the relevant time period.

4

account for the settlement funds that she received in or converted to cash. She testified that she does not know where the money went. They did "stuff." They took several trips to the beach. They went to water parks. At one point, they made weekly visits to see their father in a rehabilitation facility a few hours away. She paid for school lunches and snack breaks. Sometimes she paid teenagers in cash to help her with the chicken houses.[9] She did not buy any significant assets with the money.

## Conclusions of Law

The trustee filed the instant complaint to deny the debtor's discharge under 11 U.S.C. § 727(a)(5).[10] Under § 727(a)(5), a debtor who fails to "explain satisfactorily . . . any loss of assets" is not entitled to a discharge. "A bankruptcy court's resolution of whether a debtor has satisfactorily explained the loss of assets is a finding of fact." *Hawley v. Cement Industries, Inc. (In re Hawley)*, 51 F.3d 246, 248 (11th Cir. 1995).

The party objecting to the debtor's discharge has the burden of proving the objection. However, once the creditor has produced evidence to establish the basis for the objection, "the burden shifts to the debtor to explain satisfactorily the loss." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984) (citation omitted). "To be satisfactory, 'an explanation' must convince the judge. Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." *Id.*

In the case *sub judice*, the debtor received $271,656.61

---

[9] However, she closed her poultry operation in June 2004.

[10] The trustee also asserted a claim under 11 U.S.C. § 727(a)(3). Because the debtor's discharge is due to be denied under § 727(a)(5), consideration of the claim under § 727(a)(3) is unnecessary.

5

seventeen months before filing the chapter 7 case.  She testified that she repaid debts to her parents and Covington County Bank totaling $98,337.20, leaving a balance of $173,319.41 for which the debtor must give account.

The debtor's bank statements during the relevant time period reflect deposits of $137,652.80.  Assuming that all of these deposits represent settlement proceeds, at least $35,666.61 of the settlement proceeds never reached the debtor's bank account.  However, the debtor testified that at least $16,000 in deposits came from sources other than the settlement proceeds.  Therefore, by her own testimony, at least $51,666.61 of the remaining settlement proceeds never reached the debtor's bank account.

In addition, the debtor withdrew cash from her account in the amount of $9,793.71.  Although it is impossible to know how much of this amount is attributable to the settlement proceeds, it nevertheless represents an asset for which the debtor must account.[11]  This increases the cash for which the debtor must account to $61,460.32.

In addition, the debtor admittedly obtained cash by checks written to Babbie Quick Stop, a convenience store, during the relevant time period.  The checks total $8,348.96.  It is impossible to know how much of this amount represents cash.  However, as stated above, six checks were written for around $200, one for $300, one for $350, and one for $450.  Thirty nine of the checks were written for $100 or more.  Many of those written for less than $100 were written for even dollar amounts.  It strains credulity to believe that a large amount did not represent cash.

---

[11] At least $7,500 of this case was withdrawn during 2004 before the debtor began receiving income from storm repair work.  However, some of this money could represent income received in the regular operation of her chicken business before it closed in 2004.

6

Case 06-01022   Doc 12   Filed 10/16/06   Entered 10/16/06 08:27:11   Desc Main
Document    Page 6 of 7

However, assuming that the debtor obtained zero cash from Babbie Quick Stop, she had at least $61,460.32 cash in her possession during the 17-month period preceding bankruptcy. Of this, the debtor has satisfactorily accounted for only $6,848.75. She accounted for this amount by receipts produced at trial.

The debtor's oral explanations for the loss of this money are too "vague" and "indefinite" to be satisfactory. The debtor's testimony that "we did stuff" is inadequate. Several trips to the beach and weekly in-state visits to her former husband fail to account for the loss of money of this magnitude.

In addition, the debtor's testimony is tainted by inconsistency. With a few exceptions, the debtor testified that her expenses in the fall of 2004 were about the same as her expenses at filing. Her expenses at filing were $2,360.25 per month. However, the settlement proceeds dissipated at the rate of $10,195 per month.[12] If her expenses were only $2,360.25, where did the money go? Assuming the debtor's bank statements and cancelled checks account for some of this loss, the debtor has still not accounted, orally or in writing, for a minimum of $54,611.57 cash ($61,460.32 cash minus $6,848.75 receipts).

The court finds the debtor's explanations for the loss of this money unsatisfactory. A separate order will enter denying the debtor's discharge.

Done this 13th day of October 2006.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

---

[12] $173,319.41 divided by 17 months = $10,195.26. This calculation excludes the $98,337.20 used by the debtor to repay alleged debts to her parents and Covington County Bank.

7